IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
No. 3:05-CV-492

| | |
|---|---|
| WILLIAM C. HARDIN, JR., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| BELMONT TEXTILE MACHINERY ) | **ORDER** |
| COMPANY, WALTER RHYNE, individually ) | |
| and in his official capacity as a corporate officer, ) | |
| and JEFFREY RHYNE, individually, and in his ) | |
| official capacity as corporate President, ) | |
| ) | |
| Defendants. ) | |
| ) | |

**THIS MATTER** is before the court on cross Motions for Summary Judgment by Plaintiff William C. Hardin, Jr. ("Hardin") and Defendants Belmont Textile Machinery Company ("Belmont"), Mr. Walter Rhyne, and Mr. Jeffrey Rhyne. For the following reasons, Plaintiff's Motion for Summary Judgment is **DENIED** and Defendants' Motion for Summary Judgment is **GRANTED**.

## I. Background

Belmont Textile Machinery Company manufactures textile machines. Belmont is owned by Jeffrey and Walter Rhyne, President and CEO respectively. In recent years, Belmont has suffered a series of financial setbacks. In 2001, Belmont was on the verge of insolvency because of an expensive patent suit, September 11th, and tectonic shifts in the textile industry. In the years subsequent, almost all important financial decisions were made solely to ensure payment of its long-term debt and promote the survival of the company. These decisions included two reductions-in-force, which left the company with a "skeleton staff" of hourly employees who worked every other

1

week so they could also collect unemployment benefits. Hoping to avoid additional layoffs, Jeffrey and Walter Rhyne both worked without a salary for several months.

In November 2001, Jeffrey Rhyne called a meeting of the salaried employees and asked them to consider voluntarily foregoing part of their salary. The decision to forgo any portion of one's salary—and if so, how much—was left entirely to the employees. Jeffrey Rhyne told the employees that if they chose to participate, then they would be repaid if and when Belmont returned to profitability.

The voluntary salary reduction (VSR) amounts contributed by employees and the conditions of repayment were recorded by Vice President of Operations, Dan Dawson, and Plaintiff. Employees who elected to participate in the VSR program reported their decision and the amount to Dawson. Dawson then gave that information to Plaintiff, who created a spreadsheet containing the names of the salaried employees, their salaries, and the amount they decided to contribute to the VSR program. The conditions of repayment are undisputed, and they appeared at the bottom of the spreadsheet:

> Note: To take effect with the November 2001 payroll month with the understanding that the salary deduction amount will be paid back to employees in the form of a bonus when/if the company returns to profitability. The 401k matching funds will not be replaced in any way by the company.

Jeffrey Rhyne assumed that his employees understood that all VSR contributions would be repaid at the same time, if ever. In all, the program raised $166,593.36.

Plaintiff, William Hardin, chose to participate because finding another job with similar benefits and responsibilities would be difficult due to his age. (Hardin Dep. Excerpts, Doc. 74-2, 14.) In August 2002, Hardin was promoted to Vice President, and his salary was increased to $105,000 per year. However, given the dire financial condition of the company, Belmont could not

afford to pay Hardin his new salary. Therefore, Jeffrey Rhyne asked Hardin if he would be willing to make the retroactive raise part of his VSR. Hardin agreed.

In April 2003, Belmont's financial condition continued to deteriorate. Jeffrey Rhyne met with his three Vice Presidents—Hardin, Dan Dawson, and Dean Smith—and asked them to take an additional VSR because Belmont was continuing to have trouble meeting its payroll, paying vendors, and keeping the business running.

On June 27, 2005, Belmont fired Hardin because he allegedly spent too much time moonlighting for another company during working hours. At that point, Hardin had contributed a total of $21,505.98 to Belmont's VSR plan. Later that year, Hardin sued Belmont, insisting that he was fired because of his age, disability, health, opposition to Belmont's unlawful activities, insistence on proper reporting, and demands for payment of past wages due to employees. Hardin also alleged that Belmont promised to repay his VSRs in the form of a large bonus when the company "returned to profitability."

## II. Procedural History

### A. Initial Summary Judgment Order

On August 20, 2008, this Court granted Defendants' Motion for Summary Judgment on the Plaintiff's claims. (Order Granting Defs'. Mot. for Summ. J., Doc. 61.) Of particular relevance to the instant motion, this Court held that Plaintiff's North Carolina Wage and Hour Act claim, N.C. Gen. Stat. § 95-25.22(f) (2009), was barred by the two-year statute of limitations. *Id.*

### B. Plaintiff's Appeal to the Fourth Circuit

Plaintiff timely appealed to the United States Court of Appeals for the Fourth Circuit. *Hardin v. Belmont Textile Mach. Co.*, 355 Fed. Appx. 717 (2009). The court of appeals affirmed in part but reversed this Court's determination that Plaintiff's North Carolina Wage and Hour Act claim was time barred by statute. *Id.* at 721–23. The court held that "Hardin had no cause of action under N.C. Gen. Stat. § 95-25.7 until Belmont refused to pay him the voluntary salary reductions after he was fired," because the statute of limitations began to run only after Plaintiff was terminated. *Id.* Additionally, the court of appeals concluded that Hardin's deposition testimony was misinterpreted by this Court. *Id.*

### C. Instructions on Remand

On remand, this Court was instructed to determine the "correct construction of Belmont's promise and whether it has been broken." *Id.* at 723 n.3. The terms of the VSR plan were "[t]o take effect with the November 2001 payroll month with the understanding that the salary deduction amount will be paid back to employees in the form of a bonus *when/if the company returns to profitability*." (Br. Supp. Pl's. Mot. Summ. J., Doc. 72-1 at 2.) Thus, the two issues on remand are: (1) what is the meaning of "returns to profitability" in the context of the VSR plan, and (2) did Belmont ever return to profitability?

### III. DISCUSSION

### A. Legal Standard

Summary judgment is proper when "there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). Genuine issues exist when the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment "bears the initial burden of pointing to the absence of a genuine issue of material fact." *Temkin v.*

4

*Fredrick County Comm'rs*, 945 F.2d 716, 718 (4th Cir. 1991), *cert. denied*, 505 U.S. 1095 (1992). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of *material* fact." *Anderson*, 477 U.S. at 247–48. Material facts are those that might affect the outcome of the suit. *Id.* at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* The Court is required to draw from the evidence all reasonable inferences in favor of the non-moving party.[1] *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

**B.     Analysis**

The parties agree that the phrase "when/if the company returns to profitability" refers to Belmont's conditional promise to repay Plaintiff's VSR contributions when Belmont "returns to profitability." The parties disagree about the meaning of "returns to profitability." A court construes the meaning of the terms of a contract as a matter of law.[2] *See Askew's Inc. v. Cherry*, 181 S.E.2d 201, 203 (N.C. Ct. App. 1971).

The main issue on remand is whether Belmont returned to profitability before Plaintiff was discharged on June 27, 2005. This poses two sub-issues: first, what meaning did the parties assign to the phrase "return to profitability"; and second, did Belmont return to profitability before Hardin was terminated?  Hardin also argues that Belmont violated the North Carolina Wage and Hour Act by failing to notify him of changes to his wages.

       *1.     The Meaning of "Return to Profitability"*

---

[1] This rule applies just the same when both parties are before the Court on cross-motions for summary judgment. In the instant matter, the Court views all reasonable inferences in favor of Plaintiff because the Court is granting Defendants' Motion for Summary Judgment.
[2] This matter is governed by North Carolina contract law. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state.").

Belmont's obligation to repay Hardin's contributions to the VSR plan is conditional; it only becomes due "when/if the company returns to profitability." *See Edgerton v. Taylor*, 115 S.E. 156, 159 (N.C. 1922) (no legal obligations arise out of the nonoccurrence of a condition). This issue is one of judicial construction: What does the phrase "return to profitability" mean in the context of the parties' conditional agreement?

The process of judicial construction is difficult because "[a] word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." *Towne v. Eisner*, 245 U.S. 418, 425 (1918) (remarking on the difficulty of statutory interpretation). This is true even when the language of a promise is plain and unambiguous. *See Church v. Hancock*, 136 S.E.2d 81, 83 (N.C. 1964) (courts must give legal effect to the plain language employed by the parties); *Askew's Inc.*, 181 S.E.2d at 203. To determine the meaning of "return to profitability," the Court must look to "the intention of the parties, which is to be ascertained from the expressions used, the subject matter, the end in view, the purpose sought, and the situation of the parties at the time." *Gould Morris Elec. Co. v. Atl. Fire Ins. Co.*, 50 S.E.2d 295, 297 (N.C. 1948) (citing *Jones v. Casstevens*, 23 S.E.2d 303 (N.C. 1942)); *see Turner v. Hammocks Beach Corp.*, 681 S.E.2d 770, 774 (N.C. 2009).

When judicially constructing a contract, a court must determine the "intent of the parties when the [contract] was [executed]. . . . [If] the meaning of the [contract] is clear and only one reasonable interpretation exists, the court must enforce the contract as written." *Turner*, 681 S.E.2d at 774 (quoting *Woods v. Nationwide Mut. Ins. Co.*, 246 S.E.2d 773, 777 (1978)). "[I]f the writing itself leaves it doubtful or uncertain as to what the agreement was, parol evidence is competent, not to contradict, but to show and make certain what was the real agreement between the parties." *Id.* (citing *Root v. Allstate Ins. Co.*, 158 S.E.2d 829, 837 (N.C. 1968)). Evidence of the parties' purposes

6

in entering a contract, and their conduct after the agreement, is some evidence of their intent. *Joyner v. Adams*, 361 S.E.2d 902, 904 (N.C. Ct. App. 1987); E. Allan Farnsworth, *"Meaning" in the Law of Contracts*, 76 YALE L.J. 939, 941–42 (1967) (a word's meaning is best understood in the context of the circumstances in which it is used).

In Plaintiff's view, a "return to profitability" occurred when "Belmont declared a profit on the balance sheet for Fiscal Year 2003-2004 on March 31, 2004."[3] (Br. Supp. Pl's Mot. Summ. J., Doc. 72-1 at 9–10.) In other words, Belmont returns to profitability when it releases an income statement with positive net income.

Defendants' view is that Belmont never returned to profitability. Defendants contend that profitability means "sufficient profit to pay all recurring financial obligations necessary to continue operating the business (employee payroll, vendors, long term debt, taxes) and all VSR contributions." (Defs.' Mem. Supp. Mot. Summ. J. on Remand, Doc. 74.) In other words, a return to profitability occurs when the cash flow for a particular accounting period is equal to Belmont's recurring financial obligations, plus *all* $166,593.36 of VSR contributions.[4] Defendants also contend that because the company had no income tax liability during the relevant period (because it had a substantial amount of net operating loss carryovers) profitability should be determined by considering the company's cash-on-hand.

---

[3] It appears that Plaintiff has misused the phrase "balance sheet." The Court assumes that Plaintiff meant "income statement" because that is the only relevant financial statement where a "profit" in the colloquial sense of the word can be declared.

[4] Plaintiff argues that even if Belmont's cash account is the metric of profitability, the company nevertheless had enough cash to repay *Hardin's* VSR contributions. (Doc. 76, 9.) A return to profitability, however, is only triggered when Belmont was profitable enough to repay the VSR contributions owed the VSR plan participants and pay its ongoing obligations. (Doc. 79, 10.) Refusing to repay *individual* VSR contributions is consistent with prior company practice, including when Jeff Rhyne refused to sign over Dan Dawson's company car as repayment of Dawson's VSR contribution because it would have been unfair to the other employees who have yet to be repaid. (Doc. 74, 9.)

Neither interpretation is satisfactory. On one hand, Plaintiff's literal reading of Belmont's conditional promise would have this Court ignore his intentions at the time his contributions were made.[5] Plaintiff claimed that he participated in the VSR program because finding another job with similar benefits and responsibilities would be difficult because of his age and stature with Belmont. (Hardin Dep. Excerpts, Doc. 74-2, 14.) Thus, at the time the conditional promise was made in exchange for Plaintiff's voluntary reduction in salary, Plaintiff wanted Belmont to return to a healthy and financially solvent position. This Court will not interpret an agreement in a way that would frustrate the purposes and goals of the parties who entered into it. Such an interpretation is nonsensical and finds no support in the law. *Cf. Turner*, 681 S.E.2d at 774 ("[I]f the writing itself leaves it doubtful or uncertain as to what the agreement was, parol evidence is competent, not to contradict, but to show and make certain what was the real agreement between the parties.") (citing *Root*, 158 S.E.2d at 837). Therefore, the Court must infer that profitability means—at the very least—a healthy and financially solvent position.

On the other hand, Defendants' argument—that Belmont's cash position is determinative of profitability—proves too much. By that criterion, Belmont could avoid the occurrence of a "return to profitability" by simply reinvesting or distributing all of its cash in a way that hides its financial strength. In this scenario, the statement of cash flows would always show a weak cash position despite the fact that the company could have been quite profitable.[6]

---

[5] Which lends particular credibility to Judge Hand's admonition that "[t]here is no surer way to misread any document than to read it literally." *Giuseppi v. Walling*, 144 F.2d 608, 624 (2d Cir. 1944) (Hand, J., concurring).

[6] Nevertheless, Defendants are correct that net income cannot be used as a surrogate for profitability. First, much of Belmont's "profit" was artificial; its positive net income was distorted by the absence of income tax liability because of its substantial net operating loss carryovers. Second, Belmont operates on the accrual method of accounting. This means that revenues were reported when sales were made, not when Belmont got paid.

The proper construction of this agreement must take all of these factors into account. In particular, it must be construed to take into consideration (1) the desire of the parties to get Belmont back on its feet, (2) economic reality, and (3) fundamental accounting principles. With respect to these latter two concerns, the Court will not rely on particular financial terms like "net income" while ignoring the economic reality of a company that is on its last breath. Nor will the Court ignore fundamental accounting principles, which would dictate that net income is the first place it should look when evaluating Belmont's profitability.

Therefore, Belmont would have returned to profitability, if at all, *when it was able to pay its recurring ordinary obligations—including payments on its long-term debt—and all of the VSR contributions without needing outside capital*.

2. *Did the Condition of Belmont's Promise Materialize Prior to June 27, 2005, the Date Hardin was Terminated?*

Belmont did not "return to profitability" before it terminated Hardin because Belmont would have needed outside capital to payback the VSR wages. The need for outside capital can be determined by examining Belmont's level of financial distress, which is evidenced by Belmont's cash position, debt level, and revenue streams. In this case, the evidence of Belmont's financial distress is simply overwhelming.

In 2001, Belmont was hit with the double-whammy of an expensive patent suit and the nationwide downturn in the textile industry following September 11, 2001. As hardwood and laminate become more affordable, consumer demand for carpet had dwindled. To keep Belmont afloat, Walter and Jeffrey Rhyne—the owners and sole shareholders—had to continuously infuse personal funds into the business. Ironically, they too participated in the VSR program, and have yet to be repaid for their contributions. At one point, the Rhyne's even liquidated assets from their

retirement accounts and paid significant penalties for doing so. Finally, in 2009, Belmont became insolvent due to its long-term debt obligations and the uncontrollable systemic changes in the textile industry. To date, Belmont continues to sell its assets to repay its long-term debt obligations and has no prospects for reorganization. On these facts, Belmont is hardly the bastion of profitability as Plaintiff claims it is. Rather, it appears to be a company which has been teetering on the brink of insolvency for nearly a decade.

Nevertheless, Plaintiff repeatedly points to the deposition of Jeffrey Rhyne as evidence of Belmont's purported return to profitability on March 31, 2004, when Belmont reported a net income of $411,010 for the year.

However, examination of other financial statements—like the statement of cash flows—indicate Belmont's poor financial health despite its positive net income. A statement of cash flows is divided into three sections based on the origin of the cash flow: cash flows from operating activities, investing activities, and financing activities. Net income is considered a cash flow from operating activities. However, that number must be adjusted for expenses, inventory, taxes, accounts receivable, et cetera. Once that is done, the remainder is considered net cash provided by operating activities. For 2004, that sum was $177,046. That adjustment does not even consider principal payments on Belmont's long-term debt. When the company's long-term debt is considered, Belmont's net cash flow for 2004 was negative $83,027. This means Belmont had an $83,027 cash outflow despite a net income of $411,010. The result is that Belmont ends the year with only $96,762 in cash. In other words, Belmont could not have returned to profitability in March 2004

because it did not have sufficient funds to repay the $166,593.36 of VSR contributions to all its employees without obtaining outside capital.[7]

The same conclusion can be made for the fiscal year ending on March 31, 2005. In that year, net income was $276,063. (Doc. 74-1, 30.) Retained earnings increased by about that same amount to $690,121. *Id.* Those two numbers might lead one to mistakenly believe that Belmont was hoarding its profits. After considering the statement of cash flows, however, it is clear that Belmont had to spend nearly every penny it earned on keeping the company afloat. (*Id.*, 32–33.) In addition to spending $105,324 paying down its accounts payable, Belmont increased its inventories by nearly $145,000. *Id.* In order to pay these on-going obligations, Walter and Jeffrey Rhyne advanced the company $235,000 that year. *Id.* Despite this advance, the company had a total net decrease in cash of $64,800. *Id.* This left Belmont with $31,862 in its cash account at the end of 2005. *Id.* Therefore, if Belmont wanted to pay back the $166,593.36 of VSR contributions, it would have needed more debt or would have had to sell assets to pay those contributions back. Thus, Belmont had not returned to profitability for the fiscal year ending March 31, 2005.

The evidence as it stands is already enough for the Court to hold that Belmont did not return to profitability while Hardin was employed there. This holding is buttressed by Plaintiff's July 26, 2004 e-mail in which he acknowledges that Belmont's "profit [for the last two years] has been $0" despite $19 million in sales. (Hardin Dep. Exh. 20, Doc. 48-17, 2–3.) His e-mail also emphasizes Hardin's belief that $90,000 of raises would unacceptably "increase the risk of going bankrupt." (*Id.*

---

[7] Plaintiff makes no allegations that Defendants' mismanaged company funds by over-purchasing inventory, overextending credit, over-expensing, obtaining unnecessary debt, or distributing funds to shareholders despite ongoing financial difficulties. If evidence of such allegations was present, then perhaps more of the Court's analysis would have focused on Belmont's duties as obligor, and Hardin's rights as an obligee of a conditional promise. However, no such allegations are present. In fact, the evidence points to the opposite conclusion: The Rhyne's—rather than mismanaging a profitable company—have suffered dearly for systemic events entirely outside of their control.

at 3.) If Belmont could not afford to pay $90,000 in raises, then it certainly could not afford to repay the VSR contributions to its employees.

Lastly, the Court does not consider Belmont's financial performance for the fiscal year ending on March 31, 2006 relevant, even though Hardin was terminated on June 27, 2005, nearly three months into fiscal year 2006. Any argument to the contrary misunderstands that financial analysis is conducted in hindsight at the *end of the relevant accounting period*. In Belmont's case, the accounting period ends on March 31 of every year. Because March 31, 2005 was the last accounting day prior to Hardin's termination, it marks the last relevant accounting date for determining if Belmont returned to profitability prior to Hardin's termination.

Therefore, Belmont did not "return to profitability" on March 31, 2004, nor did it "return to profitability" prior to Plaintiff's termination.

3. *Notice under the North Carolina Wage and Hour Act*

Plaintiff argues that Hardin was not notified of the VSR plan, which in its view, constituted a change in Hardin's wages under the North Carolina Wage and Hour Act. Under the Act, Belmont is required to notify its employees "in writing . . . [of] any changes in promised wages." N.C. GEN. STAT. § 95-25.13(3) (2009). Belmont did just that. Indeed, Hardin created the very spreadsheet that notified him of the prospective forfeiture that could result from participation in the VSR plan. (Defs'. Mem. Supp. Mot. Summ. J. on Remand, Doc. 74 at 21–23.)

### III. CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Summary Judgment is hereby **DENIED** and that Defendants' Motion for Summary Judgment is **GRANTED**.

Signed: June 30, 2010

Graham C. Mullen
United States District Judge